IN THE MATTER OF THE APPLICATION OF THE ERIE RAILROAD COMPANY FOR A SUMMARY DETERMINATION AS TO CERTAIN LANDS IN JERSEY CITY WHICH HAVE BEEN ASSESSED BY THE LOCAL AUTHORITIES OF THE TAXING DISTRICT OF JERSEY CITY AND ALSO ASSESSED BY THE STATE BOARD OF ASSESSORS AS PROPERTY USED FOR RAILROAD PURPOSES.

Argued July 14, 1899—Decided November 13, 1899.

1. The scheme of taxation established by the act of 1884 (*Pamph. L.,* p. 142), re-enacted in 1888 (*Pamph. L.,* p. 269), entitled "An act for the taxation of railroad and canal property," applies exclusively to the property of railroad and canal companies; it has no relevancy to taxation on property owned by other than railroad or canal companies, although such property may be used for the convenience of such companies in the transaction of their business.

2. The Long Dock Company, the owner in fee of premises under tidewater at Jersey City, demised the same to the Erie Railroad Company. By a lease executed February 13th, 1879, between the Erie Railroad Company, party of the first part; the Long Dock Company, party of

the second part, and Jesse Hoyt, party of the third part, the premises
were leased to Jesse Hoyt, his executors, administrators and assigns,
for the purpose of erecting, maintaining and operating thereon a grain
elevator, of which the Erie Railroad Company should have the use in
the manner and upon the terms therein stated, and for no other pur-
pose, at an annual rent at the rate of seven per cent. on the value of
the demised premises in their then present condition, together with
seven per cent. on the cost of all dredging and work required to be
done by the railroad company upon the premises, to pay the water-
rents, harbor dues, taxes and assessments, which shall be lawfully
levied upon the demised premises. Hoyt covenanted to erect at his
own expense a grain elevator and pier as soon as practicable. The
agreement provided that the railroad company might become the
owner of the elevator upon payment of the purchase price of the ele-
vator erections and improvements. By a subsequent agreement it was
agreed that the lease should continue until the purchase price of the
elevator and work on the demised premises in adapting it to the busi-
ness of the company was paid. Hoyt agreed to receive at the ele-
vator, and unload, store and transfer, at his own expense, all grain
brought thereto by the cars of the railroad company. For these ser-
vices the company agreed to pay Hoyt at the rate of one and one-
quarter cents a bushel on every bushel of grain delivered by it to the
elevator. Hoyt subsequently assigned his lease and his interest in the
elevator to the Erie Elevator Company. *Held,* that the pier and the
elevator and erections thereon were the property of the lessee, and
were not taxable under the act providing for the taxation of railroad
and canal property, but that the same were taxable in Jersey City
under the General Tax law.

This is a controversy over the taxation of certain property
in Jersey City. The property in question consists of elevator
pier No. 1, and an elevator building thereon, extending into
tide-water at Harsimus Cove, on the Hudson river, and
situate adjacent to the terminus of the Erie railroad, at
Pavonia Ferry, on the Hudson. The property was assessed
by the state board of assessors under the act for the taxation
of railroad and canal property, annually, for the years 1884
to 1897, inclusive. The pier was assessed by the board at a
valuation of $92,960 until 1888 ; after 1888 the assessment
upon the pier was upon a valuation of $55,100. The elevator
building was assessed on a valuation of $600,000 throughout.
The tax laid by the state board upon this assessment was one-
half of one per cent. for state purposes and one per cent. for

local purposes. During the same period the same property was assessed from year to year by Jersey City for local taxes. These taxes, being unpaid, were adjusted by the Martin act commissioners by a report confirmed July 9th, 1898, for unpaid taxes amounting to $282,337.41, and interest, $62,970.12, making a total of $345,307.53.

The Erie Railroad Company, and its predecessors in title, paid to the state the taxes assessed by the state board. No part of the taxes assessed by Jersey City has been paid. In compliance with the statute (*Gen. Stat., p.* 3332, ¶ 239), an order was made that three justices of the Supreme Court should constitute a court to determine in a summary manner the character of said property, and whether used for railroad or canal purposes, and by which assessors the same has been lawfully assessed. The application was made by the Erie Railroad Company, and the mayor and aldermen of Jersey City and the state board of assessors were made parties.

Before Justices DEPUE, GUMMERE and LUDLOW.

For the Erie Railroad Company, *Vredenburgh & Garretson.*

For the state, *Samuel H. Grey,* attorney-general.

For Jersey City, *Allan L. McDermott* and *John W. Queen.*

The opinion of the court was delivered by

DEPUE, J. The premises in question are owned in fee by the Long Dock Company. They were leased by the Long Dock Company to the New York and Erie Railway Company, to whose rights the New York, Lake Erie and Western Railroad Company succeeded. Articles of agreement were made and executed February 13th, 1879, between the New York, Lake Erie and Western Railroad Company, party of the first part; the Long Dock Company, party of the second part; and Jesse Hoyt, party of the third part. It was therein recited that the business of the party of the first part required

the convenience and use of a grain elevator at Jersey City upon the premises, and that the party of the third part proposed to erect, maintain and operate thereon a grain elevator, of which the party of the first part should have the use in the manner and upon the terms therein provided.

The operative words in this agreement are words of demise. By the first subdivision, in consideration of the expenses incurred, or to be incurred, by Hoyt in and about the erection and completion of such elevator, and of the rent therein reserved, and of the covenants of the said Hoyt therein contained, the said party of the first part—that is, the railroad company—"does hereby let and lease unto the said party of the third part"—that is, Hoyt—"his executors, administrators and assigns, &c., all the lands and lands under water" (with a definite description by metes and bounds), "together with the entire White Star pier as at present located." By the fifth subdivision, after reciting that the premises therein demised were owned in fee by the Long Dock Company, and by it theretofore leased unto the railroad company, and that this "lease and contract" were entered into at the request of the Long Dock Company, as well upon its agreement to guarantee the performance by the railroad company of all its covenants therein, the said party of the second part—that is, the Long Dock Company—in consideration of the premises, "hereby confirms the demise aforesaid by the said party of the first part to the said party of the third part, and covenants and agrees to and with the said party of the third part that the said party of the third part"—that is, Hoyt—"shall and may have, use and occupy and enjoy the said demised premises in the manner and subject to the conditions herein provided, and that said party of the first part hereto shall and will fully, faithfully and in all respects carry out and perform the terms, covenants and agreements herein contained by it, the said party of the first part, to be performed, observed and kept."

The tenure of the party of the third part—that is, Hoyt—is defined in these words: "To have and to hold the said

lands and water rights as aforesaid for the term hereof unto the said party of the third part, his executors, administrators and assigns, for the use and purposes in this contract specified, and for no other purpose whatsoever, yielding and paying an annual rent therefor to the party of the first part and its successors." The demise to Hoyt was for a term commencing at the date of the agreement and to continue until the expiration of ten years from the completion of the elevator and its readiness to elevate grain from the railroad of the party of the first part, unless sooner determined as therein provided ; and it was stipulated that at the expiration of the said term of ten years, if the contract should so long continue, the railroad company would purchase the elevator erections and works on the demised premises at the intrinsic value thereof, not exceeding the actual cost thereof. By a subsequent agreement between the parties concerned the term was extended, and it was agreed that the lease should continue until the purchase price of the elevator erections and work on the demised premises, in adapting it to the business of the elevator, was paid—practically indefinitely.

In this agreement Hoyt covenanted that he would, on or before the 1st day of April, 1879, begin to build on said premises, and would construct and complete, as soon as practicable thereafter, a grain elevator of a storage capacity of not less than one million bushels of grain, to be provided with all modern improvements and facilities for proper and speedy unloading of cars and delivery of grain to cars, carts, boats and vessels at and from said elevator. Hoyt also covenanted to construct a pier upon which the said elevator should be erected, from the White Star pier to the westerly line of the premises therein demised, and that the elevator should be constructed upon plans and specifications which should be subject to the inspection and approval of the railroad company, the cost whereof to be reckoned as part of the costs of construction. He also covenanted that he would, at his own cost and expense, keep the elevator, its fixtures, machinery and appurtenances, and the docks and wharves

upon said demised premises, in good working order, repair and condition, and do such dredging as might be necessary for the convenient berthing of vessels to and alongside the elevator and' pier during the term of the lease.   The agreement contained specifications for the manner in which the work was to be done, how supervised, for the mode of ascertaining the cost of construction or work, and for arbitration between the parties if any dispute as to cost should arise, when the railroad company might elect to become the purchaser of the elevator erections and work done by Hoyt upon the premises.

Hoyt further covenanted and agreed to pay annually a rent at the rate of seven per cent. on the appraised value of the demised premises in their then present condition, together with seven per cent. on the cost of all the dredging and work required to be done by the railroad company upon the premises, and to pay all water-rents, harbor dues, taxes and assessments of every kind and nature, from time to time, which should be lawfully levied, assessed or imposed upon the premises thereby demised, or upon the elevator erections or improvements to be erected thereon, or in anywise affecting such demised premises or the elevator erections or improvements thereon or any part thereof.   Hoyt also covenanted that he would receive at the elevator and unload at his own expense all grain brought thereto in the cars of the railroad company for elevation, storage, weighing, transferring, blowing and screening or delivery, and would with all reasonable dispatch unload, elevate, weigh, store, transfer, blow, screen and deliver the same at the elevator from time to time as the business of the railroad company might require.   For these services the railroad company was required to pay Hoyt at the rate of one and a quarter cents a bushel on every bushel of grain delivered by it to the elevator as an agreed charge for receiving and unloading the cars, elevating and weighing the grain contained therein, including storage on the same, if required, not exceeding ten days, and the customary delivery to vessels and lighters, for which delivery Hoyt might charge

and collect from the owners or consignees of the grain or the vessels, for elevating, weighing and storage, not exceeding ten days, such charges as should be fixed by the railroad company, and apply the same on account of the one and a quarter cents a bushel to be paid by the railroad company, and pay over to it the surplus, if any.

The railroad company agreed to clear away obstructions and dredge out two basins on either side of the pier for the convenient delivery of grain from the elevator into boats and vessels, and to do all dredging necessary for the preparation and construction of the foundation of the elevator and other structures to be erected by Hoyt. It also agreed that it would lay and maintain, &c., all necessary tracks and the switches, sidings and the connections for the same to, through and around the elevator and upon the wharves or piers, and would connect the same with the railroad, and switch and move its cars in and upon the demised premises for the convenient unloading and elevation of the grain delivered by it to the elevator; that it would deliver in cars at the elevator all grain coming over its railroad, the unloading of which it might control, whether for export or for storage or transfer or delivery at or from the elevator.

The agreement further provided that Hoyt should have the right to receive in the elevator, on storage or for transfer for other persons, grain brought thereto in boats or vessels, and should be entitled in his own right to the elevating and other charges thereon, provided that such receipt did not interfere with the handling and storage of grain arriving by the railway of the party of the first part, and that he should be responsible to the railroad company, or to whom it might concern, for all grain in cars delivered by the railroad company at the elevator from the time of such delivery. The agreement contained the further provision that Hoyt should carry on the business at his own risk and expense.

The agreement provided that the railroad company might become the owner of the elevator upon the payment of the purchase price of the elevator erections and improvements,

and that thereupon the railroad company should become the absolute and exclusive owner of the same, free and clear from all liens and encumbrances of every kind, and that Hoyt or his legal representatives would make such formal transfer and conveyances of the elevator erections and improvements to the railroad company as might be required.

The tripartite agreement contains technical words of demise—a fixed term—rent reserved to be paid by the lessee, and covenants on his part to repair and keep in repair, and to pay all taxes and assessments. These are the component parts of a lease, which in legal effect operate to vest an actual leasehold estate. The elevator and improvements erected by Hoyt on the premises were beyond dispute the property of Hoyt.

The elevator was completed and ready for use on July 1st, 1880. In December, 1886, the Erie Elevator Company, a corporation of the State of New York, purchased Hoyt's estate and interest in the premises from his executors. By an agreement between the New York, Lake Erie and Western Railroad Company and the Erie Elevator Company, made and executed December 20th, 1886, the purchase by the elevator company of the executors of Hoyt was ratified and confirmed, and it was agreed that the elevator company should hold the premises during the unexpired term of said Hoyt under the original agreement, and from and after the expiration of said Hoyt's lease until the purchase price of the elevator and erections and work on the demised premises was paid. By that agreement it was stipulated that the elevator property, consisting of the elevator building, two adjacent buildings, the boiler-rooms and attachments used for coal and storage, were completed July 1st, 1880, and that the term created by the original lease began on that day, and also that the value of the premises demised to Hoyt at the date of the original lease and the cost of all dredging and work done by the railroad company aggregated $250,000, on which sum seven per cent. was to be paid as part of the "rent reserved."

The contract contains covenants between the railroad company and Hoyt with respect to the manner in which the business should be conducted between the parties. An inspection of these clauses will disclose the fact that they are agreements between Hoyt, carrying on a business for his own benefit, and the railroad company, contracting with him in respect of the business to be carried on by him for the railroad company. Until the railroad company should become the owner of the elevator and improvements erected by Hoyt by purchase, the company had no control over the premises demised, except such as enured to it by force of the mutual covenants and agreements contained in the lease. The covenant that the railroad company should lay tracks for use in connection with the business of the elevator did not deprive the tripartite agreement of its legal effect as a lease or take from the leasee his leasehold estate. The methods by which elevators, which are distinctly private property, are operated, are by connections with adjacent railroads by means of tracks running into such elevators. Tracks laid to elevators, coalchutes, docks, quarries, &c., under such circumstances remain the property of the railroad company, but do not convert private ownership in lands into railroad property. In this instance the tracks were laid under a covenant in the agreement, and became part of the premises demised, as in case of a demise of lands and a covenant by the landlord to erect houses or buildings thereon.

The agreement also contained a stipulation that the railroad company might lay a track or tracks upon the demised premises, and from time to time provide such other facilities as should be convenient or necessary for the accommodation of its general business other than grain, and might use the same. It appears in the case that only two tracks were laid upon the demised premises, which were constructed for the accommodation and use of the elevator company. The location of these tracks will be stated presently. There was also a wharf on the waterway near the easterly end of the elevator. It appears that freight, consisting of lumber, stone,

pig iron and ice, was received on this wharf and freighted over the railroad through the elevator. The proof is that only a small proportion of this sort of traffic was handled in this way. The privilege of using the tracks and facilities for this purpose was upon conditions which will presently be stated.

The elevator buildings were located at the westerly end of the pier; they occupied the entire width of the pier at that extremity. The elevator was constructed so that two tracks of railroad were run through the middle of it, extending out to the easterly end of the pier. The testimony is that when cars loaded with grain arrive, after the grain is inspected and graded by representatives of the New York Produce Exchange, the cars are run into the elevator through open doors. The grain is then taken out of the cars, placed in bins according to grade by the employes of the elevator company, then re-elevated, weighed and run through spouts into canal boats belonging to a lighterage company, another corporation, for transportation in conformity with the orders of the consignee. Other tracks of the railroad company approach the elevator at the westerly end, but none extend to it or upon the pier except the two tracks mentioned, which were designed for the delivery of grain to the elevator. The open waterway on each side of the pier is used for the berthing of boats, either loaded or waiting to load, for the transhipment of the grain after it has left the elevator. The two tracks which pass into and through the elevator are the tracks referred to in that part of the tripartite agreement which confers on the railroad company the privilege of using tracks and facilities for its general business other than grain. But it will be observed that such use was subject to a proviso that it should not obstruct or interfere with the business of the elevator, and with the further limitation that the railroad company should not handle any freight on the pier which would increase the risk of fire, and should also share in the expenses incurred by the elevator company in maintaining the piers and slips, in the ratio the number of cars of local freight other than grain dis-

charged upon the pier by it bears to the whole number of cars of grain brought to the elevator and of the cars of other freight brought to ocean vessels carrying grain from such elevator.   The testimony is that the pier is controlled in this respect by the elevator company to the extent that when grain arriving on the railroad comes in in such quantities that the placing of cars east of the elevator would interfere with the prompt unloading and handling of grain, they are not allowed there until such times as the rush of grain is over.   It will also be observed that the covenant above referred to provides for a compensation to the elevator company for the use of the pier.   The use of the pier and tracks thereon by the railroad company for its general business is by license—permission of the elevator company and for payment to be made therefor. Such use of the premises by the railroad company does not impair the leasehold estate of the elevator company therein. On the contrary, such use is under terms in subordination to the rights of the elevator company as the tenant of the premises.

The contract provides that the railroad company shall deliver the grain at the elevator, and that Hoyt shall receive it at the elevator and unload it at his own expense.   When cars loaded with grain reach the elevator and are opened, and the grain is graded by the employes of the New York Produce Exchange, it is delivered into the exclusive possession and control of the elevator company.   The custody of the grain by the railroad company ends when it is delivered at the elevator to the elevator company.   From that time until the grain is put into boats to be transported to the destination ordered by the consignee it remains in the exclusive custody of the elevator company.   The contract expressly provides that the elevator company shall unload the grain at its own expense, and shall assume responsibility therefore during the possession of it from the time of the delivery to the elevator until delivery from the elevator to the lighters or vessels. The entire expense attending the handling and custody of the grain, including the wages of employes, and the cost and

expense of maintaining the elevator, its fixtures, machinery and appurtenances, and the docks and wharves, in good working order, is assumed by the elevator company. The elevator and buildings are insured in the name and for the benefit of the elevator company. The custody of the subject-matter of this agreement is exclusively in the elevator company, and the work done therein is done by that company at its own expense, at a stipulated price to be paid to it by the railroad company. In the execution of its contract the elevator company is not operating a railroad or exercising any of the franchises of the railroad company. . It is engaged simply in performing a contract for services rendered to the railroad company in executing its contract to carry.

The state board of assessors taxed the pier, elevator and the structures thereon as the property of the railroad company. The local authorities of Jersey City have taxed it as property other than railroad property in virtue of the general statute regulating taxation.

The method of taxing railroad property now in force began with the act of April 10th, 1884, which was re-enacted in 1888, with some modifications unimportant in the consideration of this case. *Pamph. L.* 1884, *p.* 142; *Pamph. L.* 1888, *p.* 269. The title of the act of 1884, retained in the act of 1888, is "An act for the taxation of railroad and canal property." The title of these acts is significant. It expresses the legislative purpose to tax the property of railroad and canal companies. The references will be to the act of 1888. The language in the first and second sections of the act, in defining the property to be assessed and taxed in virtue of the act, is " all the property of any railroad or canal company." The description in section 1, in exempting property from taxation other than that imposed by the act, applies to the property made subject to taxation under the act. These two sections are enacting clauses in this legislation. The sections following are regulations and matters of detail. The property on which taxation is to be laid in virtue of this legislation is the property of railroad and canal companies. The property

of these companies not used for railroad or canal purposes is to be assessed and taxed by the same assessors, and in the same manner and at the same rate as the taxable property of other owners in the same municipal division or taxing district. All other property of such companies—that is, railroad and canal companies—is required to be assessed and taxed under the provisions of the act. It is also enacted that the tax imposed by this act shall be in lieu of all other taxation upon the property subject to taxation under the provisions of this act. The scheme of taxation established by this legislation applies exclusively to the property of railroad and canal companies. The classification of user or nonuser for railroad or canal purposes relates to the methods of taxing railroad or canal property as against such companies. It has no relevancy to taxation on property owned by others than railroad or canal companies, although such property may be used in connection with and for the convenience of such companies in the transaction of their business. In the present case the transportation of the grain to points of destination in the New York harbor is done by the Erie Grain Lighterage Company, another corporation of the State of New York. Compensation for such services is paid by the railroad company, as included in its charge for freight. It could not, with any plausibility, be contended that the boats of the lighterage company were property to be taxed against the railroad company under this act, although these boats are directly employed in carrying out the freighting contracts of the railroad company.

Section 14 of the act provides for the collection of taxes assessed by the state board by execution, under which, by section 15, the franchises, real estate, rolling stock and property of the company might be sold. *Gen. Stat., p.* 3329. Under constitutional principles it is manifest that the private property of other persons could not be taken for the payment of the obligations of such companies, although associated with the railroad company in the transaction of business.

Section 23 of the act provides "that if any railroad or

canal shall be owned or operated under a franchise by any individual or association not incorporated, the term ' company' used in this act shall apply to such owners or operators, and such property shall be assessed and taxed under the provisions of this act in the same manner as if operated by a company." *Gen. Stat., p.* 3332. This section applies to a situation unlike that presented in this case. It applies to cases where a railroad or canal shall be owned or operated under a franchise. The elevator company in using its property in executing its contracts with the railroad company is not engaged in operating a railroad under a franchise. It is a corporation that does not possess the franchise of operating a railroad. The construction of this section was before this court in a recent case, and it was held that the franchise intended by this section was a franchise to own or operate a railroad or canal, and that a railroad not the property of a railroad company, and neither owned nor operated under a franchise by an individual or an unincorporated association, is not subject to taxation by the state board of assessors, and such a tax was set aside. *Monmouth Park Association* v. *Assessors*, 31 *Vroom* 372. Nor is section 6 applicable to this case. That section provides "that if the property of any railroad or canal company be leased to or operated by any other corporation, foreign or domestic, the property of the lessor, or company whose property is operated, shall be subject to taxation in the manner hereinbefore directed, and if the lessee or operating company, being a foreign corporation, be the owner or possessor of any property in this state other than that which it derives from the lessor or company whose property is operated, it shall be assessed in respect of such property in like manner as any domestic railroad or canal company." *Gen. Stat., p.* 3326. This section applies to cases where the transaction concerns the operation of railroad or canal property under pretence of a franchise for operating a railroad or canal. It obviously can have no relation to the use of property in private ownership in respect to which there is no exercise of railroad franchises. The entire scheme

of taxation under the title of this statute, as well as in its enacting clauses, concerns the taxation of railroad and canal property, for the enforcement of which the franchises and property of such companies may be taken under execution in satisfaction of the taxation imposed. The purpose of this scheme of taxation was to provide a special mode of assessing railroad and canal companies for property used in the exercise of their public franchises. It was not the legislative purpose to exempt property in private ownership from the larger measure of local taxation.

In *Pennsylvania Railroad Co.* v. *Jersey City*, 20 *Vroom* 540; *S. C.*, 22 *Id.* 564, the prosecutor was assessed in Jersey City for local taxes on a grain elevator which had been erected by the company on lands conveyed to the United Railroad and Canal Companies by the state. In the conveyance it was made lawful for the grantees to fill up and improve said property, to erect thereon wharves, piers, canals, slips, storehouses, depots and other buildings, and shops and cars and enginehouses and appendages, &c., with the proviso that such part of said property and improvements as should be used for other than railroad, canal, depot, transhipping or landing purposes (but no other portions thereof) should be subject to local and municipal taxation. The prosecutor succeeded to the title of the United Railroad and Canal Companies, and had built on the land an elevator for the transhipment of grain. The elevator was used by the prosecutor exclusively for its own business, charging a small sum for storage if grain was retained there beyond ten days. The court held that the fact that a small penalty was added to the freight charges to induce shippers to remove their grain within a reasonable time did not withdraw this structure from that class of improvements which were necessary for railroad uses, within the meaning of that term. The tax was set aside on the ground that the elevator was necessary and indispensable to the prosecutor's business, and exempted from taxation as land used for railroad purposes. Decisions to the same effect are found in the courts of other states. In *Detroit Union Railroad Depot,*

&c., Co. v. *Detroit*, 88 *Mich.* 347, the Union Depot Company, a corporation organized under the Union Depot act, erected a grain elevator upon its property, which was used as a grain warehouse in connection with its general business as a common carrier. It was held by the court that the elevator was a necessary part of the company's equipment and was not liable to taxation under the general act of the state. In *State* v. *Railroad Co.*, 86 *Tenn.* 438, an elevator was built by the railroad company and used by it to receive and handle freight for transportation on its railroad from or to points on the Tennessee river. The elevator was located on the bank of the river for the purpose of shipment, and was three hundred yards from the company's right of way. The court held that the elevator was exempt from general taxation.

In the cases in our own courts, wherein lands were exempted from general taxation in virtue of the charters of railroad companies or under general laws, the lands were owned by the railroad company and used by such company for railroad purposes. *Gardner* v. *State*, 1 *Zab.* 557; *State* v. *Hancock*, 6 *Vroom* 537; *United New Jersey, &c., Co.* v. *Jersey City*, 26 *Id.* 129; *State, Morris Canal, &c., Co.* v. *Betts*, 4 *Zab.* 555; *Morris Canal and Banking Co.* v. *Love*, 8 *Vroom* 60.

The principle which controls in discriminating between taxable and non-taxable property in relation to ownership or use is illustrated in other cases. In *County of St. Louis* v. *St. Paul and Duluth Railroad Co.*, 45 *Minn.* 510, the facts were these: The railroad company owned a tract of land in the city of Duluth, one-fourth of which was unoccupied. The remainder was a coal wharf or dock built by the railroad company, but used and occupied by another corporation, the Northwestern Fuel Company, under a contract. The railroad company had run its tracks upon this dock. The contract between the railroad company and the fuel company granted to the latter the right to possess, use and occupy the wharf and dock for the term of ten years for unloading coal from vessels and the storage of the same

thereon, for which right the fuel company was to pay an annual rental in equal monthly installments. In the contract there was a provision with respect to unloading from the vessels and placing in its cars such coal as other parties than the fuel company might want to ship over the railroad, the compensation for transferring coal being fixed at a certain sum per ton. The railroad company also stipulated to switch to and from its connections in the city with other lines of railroad such cars as the fuel company might wish to points not reached by its lines of road; it was also agreed that in each year during the lease the fuel company should ship not less than fifty thousand tons of coal over respondent's lines of railroad to three specified places. It was argued that the dock and wharf, leased and occupied by the fuel company, was a necessary and convenient appendage or adjunct to the railroad, and was used by the tenant mostly for purposes connected with the railroad, and therefore it was not liable to such taxation, but was subject to that provision in the railroad company's charter which provided for a percentage upon its gross earnings in lieu of other taxation. But this contention was disallowed by the court, and it was held that the contract between the railroad company and the fuel company was a lease of the premises to the fuel company to enable it to carry on its business, and that the wharf and dock were liable to taxation under the general law. In *Illinois Central Railroad Co.* v. *People*, 119 *Ill.* 137, it was decided that an elevator of the Illinois Central Railroad Company, built upon its right of way, leased to private persons, holding as agents of the company under an agreement to pay a compensation for its use, was not exempt under the charter of the company, it not being used exclusively by the company in the exercise of its franchise. See also *Gilkerson* v. *Brown*, 61 *Ill.* 486.

The principle that regulates the taxation of such property is illustrated by comparing the two classes of cases above cited. Other cases illustrative of the same principle will be found in 12 *Am. & Eng. Encycl. L.* (2d ed.) 365. Elevators, coal-chutes and wharves, erected on private property at the

expense of private owners engaged in merchandising or shipping, to which switches and railroad tracks are laid for the accommodation of the owners, from which the railroad company derives benefit in freightage, are not uncommon in the large cities. They are regarded, as in fact they are, private property, and taxed as such. The owners of such property, in availing themselves of railroad facilities, do not exercise any of the franchises of a railroad company. They simply enjoy, in the conduct of their own business, the advantages of railroad facilities furnished by the railroad company.

Regarding the covenants, conditions and stipulations in the agreement between the railroad company and Hoyt, it is apparent that if Hoyt had owned the property or leased it from private owners, and transacted upon it the business contemplated by that agreement, the property would undeniably have been private property, subject to taxation under the general law. That he derived his title through the railroad company does not change the character of the transaction.

We think that the property, consisting of the elevator, the pier, and the structures thereon, is not property such as is taxable under the act for the taxation of railroad and canal property, and that the same is liable to taxation by Jersey City under the general law regulating taxation. It is insisted that this property, being lands under water, is so situate as not to be taxable by Jersey City. The Long Dock Company and the Erie Railroad Company demised the premises by metes and bounds as lands owned by the Long Dock Company. Hoyt accepted the lease, and has improved and occupied the premises as private property. The state, as well as Jersey City, has taxed it as property liable to taxation. Under these circumstances the question of the taxability of this property is not involved in this proceeding.

The act under which this proceeding is had authorizes the court to determine in a summary manner the character of the property, and whether used for railroad or canal purposes, and by which assessors the same has lawfully been assessed. It also authorizes the court, by its judgment, to direct a can-

cellation or reduction of either assessment, as the character of the property may require, and to make such order for the return of any tax, or any portion thereof, that may have been paid to the state or to any taxing district not entitled thereto, as the court shall deem just. *Gen. Stat.,* p. 3332, ¶ 239. From 1884 to 1897, inclusive, the premises in question were assessed by the state board and returned to the treasurer of the state. These taxes were voluntarily paid by the railroad company, and it must be assumed that Jersey City annually received its share of the same. During the period above mentioned the premises were assessed for taxes by Jersey City. No steps were taken for the collection of these taxes, nor were any steps taken to have the assessment of these taxes set aside. By the charter of Jersey City taxes on real estate remain a lien until paid. *Pamph. L.* 1871, p. 1094. To recall from the state the taxes in question for the whole period would be unjust. By general acts passed March 25th, 1863, March 14th, 1879, and April 2d, 1888, taxes assessed on real estate were made a lien for the period of two years from the time they were assessed and payable. *Gen. Stat.,* p. 3352, § 325; *Id., pp.* 3353, 3359, § 368; *Id., p.* 3359, § 371. Whether the act of 1888, amending the act of 1879, in connection with the supplement of May 6th, 1889, affects the charter of Jersey City with respect to the lien on real estate for the payment of taxes we have not considered. In determining what action would be just, the court is at liberty to adopt in this proceeding the limitation contained in the statutes referred to as the legislative expression of public policy. This application was made to the court September 2d, 1898. The order will be that so much of the taxes as were assessed against the said property by the state board of assessors for the two years preceding the date of this application shall be canceled. Counsel will be heard with respect to the form and the details of the order. No costs will be allowed.