DIVISION OF TAX APPEALS.

SHELTON PITNEY AND WALTER P. GARDNER, TRUSTEES OF THE PROPERTY OF THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, PETITIONERS, v. FRANK E. WALSH, DIRECTOR OF TAXATION, DEPARTMENT OF TAXATION AND FINANCE, RESPONDENT.

THE CITY OF JERSEY CITY, PETITIONER, v. FRANK E. WALSH, DIRECTOR OF TAXATION, DEPARTMENT OF TAXATION AND FINANCE, AND SHELTON PITNEY AND WALTER P. GARDNER, TRUSTEES OF THE PROPERTY OF THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, RESPONDENTS.

Decided February 11, 1947.

For the petitioners Shelton Pitney and Walter P. Gardner, trustees of the property of the Central Railroad Company of New Jersey, *Joseph F. Aulenrieth* and *William F. Hanlon.*

For the City of Jersey City, *Charles A. Rooney* and *Joseph C. Glavin.*

For the State of New Jersey, *Walter D. Van Riper,* Attorney-General, *Benjamin V. Van Tine* and *Benjamin M. Taub,* Deputy Attorneys-General.

CONKLIN, COMMISSIONER. These appeals are from the assessments of certain properties owned by the trustees of the Central Railroad Company of New Jersey made by the Director of Taxation for the year 1945 under the provisions of *R. S.* 54:29A–1, *et seq.; N. J. S. A.* 54:29A–1, *et seq.* These assessments were formerly made by the State Tax Commissioner, but under the provisions of *R. S.* 52:27B–48 to 52–27B–51; *N. J. S. A.* 52:27B–48 to 52:27B–51 (laws of 1944, chapter 112), were transferred unto the Director of the Division of Taxation. The trustees of the Central Railroad Company filed a complaint seeking reductions and the City of Jersey City filed a complaint seeking increases in these assessments. The Attorney-General defends the assessments and requests that they be affirmed as made by the Direc-

tor of Taxation. Inasmuch as these complaints involve common questions of law and fact they were tried together.

Like the railroad tax litigation that has preceded the hearing of this case, the record is voluminous, and by stipulation of counsel, contains the record of the 1943 and 1944 testimony and exhibits as well as the testimony and exhibits in this, the 1945 appeal of the Central Railroad Company. In all it contains more than 3,500 pages of testimony, and some 150-odd exhibits introduced by the Railroad, the City of Jersey City, and the state.

The Central Railroad introduced proof by real estate experts and men familiar with railroad operation. It is the contention of its trustees that the assessment on second class lands in Jersey City should be reduced to $6,095,835, from the assessed valuation of $22,385,844, as found by the Director of Taxation; and that the assessment of the main stem or first class lands in the City of Jersey City and Bayonne should be reduced from $2,338,293 to the sum of $711,970.

The City of Jersey City seeks an increase in the valuation of the second class lands in the terminal area of Jersey City for the year 1945 to the sum of $40,764,090; and also requests that the assessment of certain structures owned by the railroad should be substantially increased.

In the complaint filed by the City of Jersey City, it was alleged that part of the property of the railroad assessed as main stem or first class was improperly assessed by the Director of Taxation, and the city requests that the Division transfer these properties to second class. No proofs were taken by the Division of Tax Appeals on this portion of the case, and it still remains on the calendar for disposition. Consequently this opinion does not deal with reclassification.

The property under appeal consists of a large waterfront railroad terminal fronting on the junction of the Hudson River and the upper New York Bay. It is opposite the southerly tip of the Island of Manhattan, and a portion of it is directly to the west of Ellis Island. The northerly portion of these lands is bounded by Johnson Avenue in the City of Jersey City. It is substantially described by President Waesche in his opinion reported in the case of the same par-

ties in 20 *N. J. Mis. R.* 449, 450, 451; 28 *Atl. Rep.* (*2d*) 660, and also in the opinion of the Board of Tax Appeals reported in the case of *Pilney* v. *Kelly,* 21 *N. J. Mis. R.* 408, 409; 34 *Atl. Rep.* (*2d*) 547.

As witnesses for the Railroad, Ralph E. Thompson, property manager of the Central Railroad, and Charles W. Morrison testified as to the value of lands. William Wyer and Thompson gave proof as to the segregation of income, and Phillip Kelly testified in regard to the income account of the railroad property. The testimony and proofs offered by the railroad through these witnesses was the same theory of an economic approach to the value of the lands and property as was advanced in the 1942 assessment and appeal which was passed upon by the Supreme Court.

Mr. Justice Perskie, in the opinion of the Supreme Court in the 1942 railroad appeals, *State of New Jersey et al.* v. *State Board of Tax Appeals,* 134 *N. J. L.* 34; 45 *Atl. Rep.* (*2d*) 599, 604, said:

"We find no occasion to enter into the realm of theorization, imagination and supposition. To do so would negate the fact that taxation is indeed a complex, living reality. And its solution is sufficiently complicated without making it more so. To do so is moreover to run afoul of the firmly establish principle of law that it is the particular or special use to which the railroad property is in fact put which has supported and continues to support its legally favored and separate classification, and which further supports the legislative power to impose a separate and different tax thereon, so long as the classification is proper and embraces all property in the classification. *Jersey City* v. *State Board,* 133 *N. J. L.* 209; 43 *Atl. Rep.* (*2d*) 799.

"Central's proof in support of its stated theory has little if any value in determining the true value of its property."

Thus the theory of an economic approach as advanced by counsel through the testimony of Wyer, Thompson and Kelly has not been given approval by the Supreme Court in its latest opinion in regard to railroad taxation. This Division has held that we are bound by the decisions of the Supreme Court and cannot establish a rule that might be uprooting. (See

*Central Railroad Company of New Jersey* v. *Marlin,* 1934-1935 *New Jersey Tax Reports, p.* 82.)

In the instant case the railroad separated the 640 acres of its terminal in Jersey City into two parts, and claimed that approximately 40 per cent. of it was used for rendering unprofitable services such as commuter, passenger, and marine freight traffic, and that the remaining 60 per cent. yielded a substantial profit. Theoretically it then stripped the land of all equipment and use for railroad purposes and proceeded to value the property for commercial or industrial purposes, then took 60 per cent. of such valuation and urged that that was the true value of the property for railroad purposes.

In the case of *Central Railroad Company of New Jersey* v. *Martin,* 114 *N. J. L.* 69; 175 *Atl. Rep.* 637, it is held that consideration be given to the value of lands used for railroad terminal purposes. The location of such lands, their availability for railroad use, the increment, if any, resulting because of the assemblage and consolidation of all the lands as an entirety, are to be considered in connection with the railroad as a going concern. The court stated that the special value of the lands, clothed with the aforesaid factors and used accordingly for railroad terminal purposes has long received judicial recognition and approval. This method was employed by the Director of Taxation as was done in the 1942 case by the Commissioner of Taxation.

The Director's right to use his personal knowledge and judgment of the value of any of the property is stated in *R. S.* 54:19A-67; *N. J. S. A.* 54:19A-67. His valuations are not to be set aside unless the proofs establish palpable error in said valuations. The Supreme Court stated that in the 1942 case there was no testimony of a sale of any waterfront land in railroad use, and that the sales testified to for the purpose of proving value were not comparable, either because of location, size, or other special. circumstances which would defeat the probative force sought to be given to them. And so in the instant case there was no testimony of the sale of any land in railroad use and the sales testified to were not comparable, either because of location, size, or other special circumstances.

In regard to the first class property or main stem assessments, *Exhibit SC-1* of the Central Railroad shows that the average rate per acre has been fairly constant, and *Exhibit SC-2* offered by the state shows that the assessment value of main stem property has likewise as a whole been fairly constant, except that in 1939 an allowance was made for functional depreciation and a further functional depreciation was allowed in 1940. This allowance for functional depreciation was eliminated in 1942. Acting under the mandate of the provisions of *R. S.* 54:29A–17; *N. J. S. A.* 54:29A–17, the Director determined and ascertained the length and value of the main stem of each railroad, and the length of such main stem in each taxing district. From the exhibits and his testimony, it appeared that the Director valued the lands including clearing and grubbing and graduation, but not including passenger and freight buildings, as an integral part of the main stem from the standpoint of its contribution to the value of the main stem as a whole. In that valuation he was supported by Henry Leroy Fryer, chief engineer and supervisor of the Engineering and Railroad Tax Bureau in the Department of Taxation, who for forty years had been senior assistant engineer under the late Louis Focht.

Since this method does not vary from that used in the determination of assessment in the 1942 case, and has been approved by the Supreme Court, and further since there was no palpable error established in this method and the valuation arrived at thereunder, we believe this method was proper and correct.

In regard to the overhead bridges, the Central Railroad claims they are not used for railroad purposes and therefore should not have been included in the assessment and taxed by the state as part of the main stem or first class property. It has been held, in the case of *State of New Jersey et al.* v. *State Board of Tax Appeals, supra,* that these bridges used to conduct vehicular and pedestrian traffic above the roadbed of the railroad are a part of the railroad and should be assessed as such. The Central Railroad further claims that in the elimination of certain grade crossings the cost of certain items was improperly included in the assessment under

*R. S.* 54:29A–10; *N. J. S. A.* 54:29A–10. This claim has likewise been disposed of by the Supreme Court in *State of New Jersey et al.* v. *State Board of Tax Appeals, supra,* which ruling we must follow in finding that the assessments are proper.

The City of Jersey City called William C. Stewart, John J. Mantell and George J. Daly as to the value of lands. The testimony offered by them does not overcome the presumption of the correctness of the assessment, for their testimony does not show that the Director was guilty of palpable error in the assessments as made.

As to the structures, the city offered the testimony of Hugh Phillips, together with a rather voluminous exhibit marked *JC 47A.* This witness made a quantitative survey by breaking down the cost of the component parts, which breakdown showed labor and material costs and then allowed a reduction of these costs on a percentage basis. We do not feel that the proofs offered by Jersey City warrant that the assessment made by the Director on the structures be discredited.

Both complaints should be dismissed, with the exception of that portion as to reclassification.

Judgments have been entered in accordance with the foregoing conclusions.

WAESCHE, PRESIDENT. (Dissenting.) The "Railroad Tax Law of 1941" levies an annual property tax upon all property used for railroad purposes. (*N. J. S. A.* 54:29A–7.) For the purpose of computing the amount of the tax, railroad property is assessed at its true value by the Director of the Division of Taxation in the Department of Taxation and Finance. (*N. J. S. A.* 54:29A–17.) The statute also provides that railroad owned property not used for railroad purposes "shall be assessed and taxed by the same assessors, *in the same manner* and at the same rate as the taxable property of other owners in the same taxing district." (*N. J. S. A.* 54:29A–4.) *Quære:* Is the true value of land used for railroad purposes greater than the true value of comparable land not used for railroad purposes? Although the decision of the majority members of the Division of Tax Appeals would seem

to answer this question in the affirmative, there is no factual evidence which supports that proposition. Since there is no factual evidence to support a higher assessment on land in railroad use than on comparable land not in railroad use, then we have this question: Has the legislature provided a criterion for determining the true value of land in railroad use different from that used to determine the true value of comparable land not in railroad use?

The statute permits any railroad or taxing district to contest the amount of any assessment on property by appealing to the Division of Tax Appeals. (*Pamph. L.* 1942, *ch.* 337; *N. J. S. A.* 54:29A–31.) The statute requires the Division of Tax Appeals to hear any such appeal and to correct, adjust, and equalize any assessment appealed from if it appears that such assessment is "excessive, insufficient or that there has been illegal discrimination in the assessment." (*Pamph. L.* 1942, *ch.* 337; *N. J. S. A.* 54:29A–33.) State officers and boards are bound to perform their public duties. *State* v. *Erie Railroad Co.*, 23 *N. J. Mis. R.* 203, 213; 42 *Atl. Rep.* (*2d*) 759. But they have no power or authority except that prescribed by the legislature, and all official actions are subject to such limitations as may be imposed by the constitution and by the legislature. 46 *C. J.* 1031, § 287. "The only authority possessed by assessing officers or boards is that conferred by statute either expressly or by necessary implication." 3 *Cooley Taxation* (*4th ed.*), § 1054. Hence, the Division of Tax Appeals in the Department of Taxation and Finance of the State of New Jersey, being a special statutory tribunal, is strictly limited to its statutory powers. *Washington Township* v. *Mercer County Board of Taxation*, 85 *N. J. L.* 547; 89 *Atl. Rep.* 1028; *Hoboken* v. *Kelly*, 21 *N. J. Mis. R.* 193; 32 *Atl. Rep.* (*2d*) 710. Since assessments for the purposes of taxation are so important to the public welfare and to the taxpayers "the statutory provisions in regard thereto ought to be observed with particularity." 3 *Cooley Taxation* (*4th ed.*), § 1060. The United States Supreme Court said that, "Of all the powers conferred upon government that of taxation is most liable to abuse" (*The Citizens' Savings and Loan Association of Cleveland, Ohio,* v. *Tokepa City*, 20 *Wall* 655; 22 *L. Ed.* 455).

The problem of assessing land at its true value is always a difficult one. It becomes particularly vexatious in the assessment of the true value of land used for railroad purposes. Every year for many years the question of the true value of the land involved in this and other railroad appeals has been litigated. Our Supreme Court is now congested with these appeals. The taxing of railroads has been the cause of many lively battles in our legislature. It has been a persistent issue for the past twenty-five years in our state's political campaigns. Consequently, much confusion and much misunderstanding have arisen concerning the proper way to appraise land in railroad use. And since "The Railroad Tax Act of 1941" is an innovation in railroad taxation in New Jersey, a study of the history of railroad taxation in New Jersey is necessary in order to understand the method intended by the legislature for determining, under this new act, the true value of land used for railroad purposes. We are bound to follow the method prescribed by the legislature; we cannot adopt a method of our own. Such a historical review might also make perspicuous the diverse contentions regarding the true value of railroad property which now appear hazy and perplexing. It might even lead to a final and proper settlement of this very troublesome tax puzzle. The Court of Errors and Appeals said that "we are under a duty to refer to the history of the times 'to ascertain the reason for, and the meaning of the provisions of a statute, and to the general state of opinion, public, judicial and legislative, at the time of the enactment. And the unmistakable evidence of such contemporaneous circumstances of the intention of the legislature should govern the construction of a statute whose terms are left doubtful by its language, and whose object is the correction of an abuse.'" *Crater* v. *County of Somerset,* 123 *N. J. L.* 407, 413; 8 *Atl. Rep.* (*2d*) 691, 696.

. The Camden and Amboy Rail Road and Transportation Company was one of the pioneer railroads in America. Its construction between South Amboy and Camden was completed in 1834. Although now a part of the Pennsylvania Railroad, it was incorporated by a special act of the legislature of New Jersey in 1830. (*Pamph. L.* 1830, *p.* 83.) In

1831 the legislature of New Jersey incorporated the Paterson & Hudson River Rail Road Company. (*Pamph. L.* 1831, *p.* 24.) This railroad is now a part of the Erie Railroad. In 1831 the legislature also incorporated the Elizabethtown and Somerville Rail Road Company. (*Pamph. L.* 1831, *p.* 80.) This railroad was the parent of the Central Railroad of New Jersey. In 1835 the legislature incorporated the Morris and Essex Rail Road, which is now a part of the Delaware, Lackawanna and Western Railroad. (*Pamph. L.* 1835, *p.* 25.)

In addition to the aforesaid railroads, the legislature, between 1830 and 1869, by special statutes, incorporated many other railroad companies. Each such incorporating act provided a method for taxing the railroad it created. In no instance was a tax levied on railroad property. The railroad was usually taxed at a fixed rate upon the railroad's capital stock or its cost, and in every instance, the statute provided that "no other tax or impost shall be levied or assessed upon said company."

In 1839 in the case of *State* v. *Berry et al.,* 17 *N. J. L.* 80, the Supreme Court of New Jersey held that by reason of the charters issued to railroad corporations which provided "that no further or other tax or impost shall be levied or assessed upon said company" the legislature had exempted the property of such railroads from taxation. See, also, the case of the *Camden and Amboy Rail Road Co.* v. *Hillegas et al.,* 18 *N. J. L.* 11.

In 1869 the legislature passed an act entitled "An Act Relative to Transit Duties." (*Pamph. L.* 1869, *p.* 226.) That act provided for a tax of one-half of one per centum upon the cost of railroad property "until the Legislature shall by general law impose a uniform tax equally applicable to all railroad and canal corporations of this State."

Not until 1873 did the legislature undertake to tax real property used for railroad purposes. In that year an act entitled "An act to establish just rules for the taxation of railroad corporations, and to induce their acceptance and uniform adoption" was adopted. (*Pamph. L.* 1873, *p.* 112.) The purposes of the act were recited in its preamble as follows:

"Whereas, for the encouragement of railroad enterprise, laws creating and regulating railways in this state usually provide for the payment by them, in consideration of their chartered privileges, of a fixed rate upon their capital stock or the cost of their works, in lieu of all other public impositions whatever; and whereas, it is nevertheless contended that the property of such corporations being largely acquired for, or through the growth and extension of their prosperity, should contribute to the charges and expenses essential for municipal and county purposes; and whereas, it is desirable in order to the avoidance and litigation and future dissatisfaction that such municipal and county taxation shall be authorized, and that the same shall be permanently fixed and regulated; now, therefore,"

The foregoing act provided for a county and municipal tax of one per centum upon the "value" of real property "occupied, used, or owned" by railroads accepting the provisions of the act. In the case of *State Board of Assessors* v. *Central Railroad Co.*, 48 *N. J. L.* 146 (at *pp.* 273 to 276); 4 *Atl. Rep.* 578, the Court of Errors and Appeals discussed the foregoing statute and reviewed the history of legislation up to that time (1886) imposing taxes on railroads.

On September 28th, 1875, the constitutional amendment providing that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value" became effective. (Article 4, section 7, paragraph 12.) This Constitutional amendment requires that tax assessments on land must be made "by uniform rules" of valuation. In the June term, 1877, the New Jersey Supreme Court said in the case of *State, North Ward National Bank* v. *City of Newark*, 39 *N. J. L.* 380 (at *p.* 391), "That it was intended by this amendment to establish a uniform rule, *which should be the only rule for assessing property,* is so plainly manifested in the language used as to admit of no doubt." Although the decision of the Supreme Court was reversed by the Court of Errors and Appeals, this interpretation of the constitutional amendment was not changed. In the March term, 1879, the Court of Errors and Appeals said in the case of *Trustees of Public Schools* v. *City of Trenton*, 30 *N. J. Eq.* 667 (at *p.*

678), that the object of the constitutional amendment was to secure "the equalization of taxation, so far as was practicable, by requiring the imposition of taxes on property by general laws, on the principle of uniformity in the subjects of taxation and in valuations." In the November term, 1881, the Supreme Court said in the case of *Stratton* v. *Collins,* 43 *N. J. L.* 562 (at *p.* 566), that, "If it is made to appear that a rule of valuation has been adopted * * * which is intended to operate unequally * * *, then the rule of uniformity is abandoned * * *." Different kinds, grades, or classes of property may have different market values. True value, however, is a standard of value characteristic of all kinds, grades, or classes of property, and peculiar to no one species so as to make it a class by itself. By uniform rules is meant uniformity in the standard of valuations; and these uniform rules require that all property be assessed alike. This is a constitutional mandate.

In 1884 the legislature adopted an act entitled, "An Act for the Taxation of Railroad and Canal Property." (*Pamph. L.* 1884, *p.* 142.) This act made the first definite change in the state's policy of taxing railroads and began the taxation of property in railroad use at its "true value." Section one of the act provided:

"That all the property of any railroad or canal company not used for railroad or canal purposes shall be assessed and taxed by the same assessors and in the same manner, and at the same rate as the taxable property of other owners in the same municipal division or taxing district; * * *."

Section three of the act provided that the "true value of all property used for railroad or canal purposes" should be ascertained separately as follows:

1. The value of the main stem.

2. The value of other real estate used for railroad or canal purposes in each taxing district.

3. The value of all tangible personal property.

4. The value of the franchise.

Section four of the act provided:

"That if the assessed value of the real estate of persons other than railroad or canal corporations in any taxing dis-

trict wherein such railroad or canal property may be found, as ascertained by the assessors of such taxing district, is relatively lower than that which has been laid upon the land of the several companies in said taxing district, the said board shall be required to accept said valuation of the assessors for such taxing district as a correct standard of value and to thereby correct or reduce the separate valuation provided for in the second subdivision of section three of this bill."

Thus, the Railroad Tax Act of 1884 provided that (1) all land owned by a railroad but *not used for railroad purposes* should be assessed locally *in the same manner* as all the other land in the same taxing district was assessed, and that (2) land in the same taxing district *used for railroad purposes,* except the main stem, should be assessed at no greater value than similar land not in railroad use was assessed. The legislature intended to assess the value of land in railroad use by the same method used for determining the true value of all the other land in a single taxing district, *i. e.,* by uniform rules. It made no difference who owned the land in the legislative scheme for ascertaining its true value. The legislature of 1884 contemplated that land *owned by a railroad company could have no greater value than the same land would have if owned by any other person or corporation,* and therefore its value was not increased by its use for railroad purposes.

In an opinion rendered in the March term, 1886, upholding the Railroad Tax Act of 1884 as constitutional, the Court of Errors and Appeals said that the tax provided for in the act was a tax on property and included the franchise as property. *State Board of Assessors* v. *Central Railroad Co.,* 48 *N. J. L.* 146; 4 *Atl. Rep.* 578. Chancellor Runyon in his opinion said that franchises are undoubtedly property, and as such are taxable. "The act provides," he said, "that the State Board of Assessors shall ascertain the value of the franchises separately. They are to ascertain their true value. They have a value which can be estimated."

The fourth section of the act of 1884 was declared unconstitutional by the Court of Errors and Appeals in the case of *Williams* v. *Bettle,* 51 *N. J. L.* 512; 18 *Atl. Rep.* 750. In its opinion the court said:

"The constitution requires that property shall be assessed for taxes according to its true value. In carrying out this provision, of course, it is necessary that the judgment of some person should be taken as the final criterion of the true value of each parcel of property assessed, and it undoubtedly falls within the province of the legislature to say who this person shall be. If the legislature had directed the local assessors to determine the true value of the property used for railroad purposes in their several districts, and the state board to fix the tax upon the value so ascertained, the constitutional injunction would have been satisfied. But no such enactment exists. The local assessors have no authority to determine the true value of property used for railroad purposes, nor is such a power conferred upon any persons except the State Board of Assessors and the Supreme Court on *certiorari*. The legislature might lawfully require the state board and the Supreme Court, in exercising this function, to consider the estimate which the local assessors put upon other than railroad property, but they cannot require the acceptance of this estimate as the correct standard of the value of railroad property. The property so taxed would be assessed, not according to its own true value, but according to the true value of some other property. Such a tax the legislature cannot sanction. This attempt of the legislature to substitute for the 'true value' of railroad property 'the assessed value of the real estate of persons other than railroad or canal corporations,' 'as a correct standard of value,' for railroad property, is unconstitutional, and must fail."

In 1888 the legislature revised and amended the Railroad Tax Act of 1884, and eliminated certain provisions which had been declared unconstitutional, but otherwise preserved the general scheme of the 1884 act. (*Pamph. L.* 1888, *p.* 269.) A discourse on the history and the provisions of both the 1884 and 1888 acts will be found in the opinion of the Supreme Court, November term, 1899, in the case of *In Matter of Taxation of the Erie Railroad Co.,* 64 *N. J. L.* 123; 44 *Atl. Rep.* 976, and in the opinions of the Court of Errors and Appeals, in the case of *Bergen and Dundee Railroad Co.* v. *State Board of Assessors,* 74 *N. J. L.* 742; 67

*Atl. Rep.* 668, March term, 1907, and in the case of *Central Railroad Co.* v. *State Board of Assessors,* 75 *N. J. L.* 120; 67 *Atl. Rep.* 672, November term, 1907.

Except for some minor changes, the Railroad Tax Act of 1884 as revised and amended by the act of 1888 (*R. S.* 54:19–1, *et seq.; N. J. S. A.* 54:19–1, *et seq.*), was the law under which land used for railroad purposes was assessed and taxed until 1941, when these acts were repealed by chapter 291 of the laws of 1941. (*N. J. S. A.* 54:29A–1, *et seq.*)

As I have pointed out, the revision of 1888 provided that the true value of land used for railroad purposes must be determined separate and apart from any value attributed to the railroad franchise. In the case of *Long Dock Co.* v. *State Board of Assessors,* 78 *N. J. L.* 44; 73 *Atl. Rep.* 53, the Supreme Court held that it was absolutely essential to the integrity of the taxing scheme of this act that the valuation assessment placed upon the land used for railroad purposes should not include any element of value that may be imparted to it by the railroad franchise. "We think," the court said, "that the increase of value over and above its market value that is imparted to second-class railroad property by reason of its use under a railroad franchise should not be included in the valuation of such property, \* \* \* and that the opposite course would be directly contrary to the scheme of such act. \* \* \* Hence \* \* \* in the ascertainment of the value of second-class railroad property \* \* \* no element of value imparted to such property by its franchise use should be included \* \* \*." This decision of the Supreme Court was affirmed by the Court of Errors and Appeals. *Long Dock Co.* v. *State Board of Assessors,* 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135. In this decision the court merely followed the legislative policy for assessing land used for railroad purposes approved in the original Railroad Tax Act of 1884. There can be no doubt that the legislature intended to continue under the revision of 1888 the same scheme for taxing railroad property it had formulated in the original act. A similar plan of taxation was before the United States Supreme Court in the case of *Adams Express Co.* v. *Ohio State Auditor,* 166 *U. S.* 185, 220; 17 *S. Ct.*

604; 41 *L. Ed.* 965, 977, and in that case the court said, by way of illustration: "If a statute, properly construed, contemplates only the taxation of horses and wagons, then those belonging to an express company can be taxed at no higher value than those belonging to a farmer."

Since the right of a railroad company to acquire, hold, and use land for railroad purposes comes directly from the corporate franchise, land can have no increment in value for railroad purposes unless the owner thereof also holds a franchise to operate a railroad. It is therefore the franchise that represents any additional value for railroad use. In the case of *Morgan* v. *Louisiana,* 93 *U. S.* 217, 223, the United States Supreme Court said that "The franchises of a railroad corporation are rights or privileges which are essential to the operation of the corporation, and without which, its road and works would be of little value." Therefore, any value attributed to the land by reason of its use for railroad purposes would be adding a value not inherent in the land but a value taken from the value of the franchise. This would be improper because the franchise has a value which is assessed separately under the statute; and if the land value is also enhanced by reason of the franchise, then the value of the franchise would be assessed twice.

Railroads in New Jersey are public highways. Their purpose is the transportation of passengers and property for the general public. The legislature expressly declared them to be public highways in the early statutes incorporating them (*Pamph. L.* 1830, *p.* 83; *Pamph. L.* 1831, *p.* 24 and *p.* 80; *Pamph. L.* 1835, *p.* 25, and others), and the courts have also held that railroads are public highways. In the case of *Rar. Del. Bay R. Co.* v. *Del. & Rar. Canal & C. & A. R. & T. Co.,* 18 *N. J. Eq.* 546, 570, the Court of Errors and Appeals, November term, 1867, said that "A railroad for popular use is *publici juris* \* \* \*." In the case of *Olcott* v. *Supervisors of Fond du Lac Co.,* 16 *Wall* 678; 21 *L. Ed.* 382, decided March 31st, 1873, the United States Supreme Court said:

"That railroads, though constructed by private corporations and owned by them, are public highways, has been the doc-

trine of nearly all the courts ever since such conveniences for passage and transportation have had any existence. * * * Though the ownership is private the use is public. So turn-pikes, bridges, ferries, and canals, although made by individuals under public grants, or by companies, are regarded as *publici juris.*"

See, also, the case of *Milheim* v. *Moffat Tunnel Improvement Dist.*, 262 *U. S.* 710, 719; 43 *S. Ct.* 694; 67 *L. Ed.* 1194, 1200. And in the case of *Pennsylvania Railroad System* v. *Pennsylvania Railroad Co.*, 296 *Fed. Rep.* 220, decided February, 1924, (*affirmed*, 1 *Fed. Rep.* (*2d*) 171; *affirmed*, 267 *U. S.* 203; 45 *S. Ct.* 307; 69 *L. Ed.* 574), the court said:

"There is no question of an invasion of private rights involved in the regulation by law of the management of a railroad, because every railroad is a public highway which is committed to the custody, care, and operation of the company, or its managers, for public use and * * * such public highway is no more the private property of the railroad company than a public road belongs to the township supervisors, in whose charge and care it is."

In the case of *McGregor* v. *The Erie Railway Co.*, 35 *N. J. L.* 89, 96, 97, the New Jersey Supreme Court, during the June term, 1871, said:

"A railroad, *although a public highway,* is such *sub modo;* it is not adapted to the ordinary modes of travel. The public have a common right to use its conveniences, but such use must be according to the mode in which railroads are operated. The building and running of a railroad for public use are of public right, and require legislative sanction. The right to construct a turnpike for public use is also a franchise, but of a simpler nature. The building of it merely, exhausts its scope, except as to tolls, and subject thereto the public use of it, according to the ordinary modes of travel. It is not a necessary part of governmental duty to provide vehicles for transportation upon it. The franchises necessary to construct a railroad are greater. From the very nature of that mode of travel, they must consist of the road itself and the running of it. The public have no common right to operate

a railroad. The construction of the road as a material thing affords no accommodation to the public; and in order to complete it as a highway in which the public may be entitled to a common use, it is necessary that the state should authorize it to be operated. A railroad is not a highway that the public should be permitted to use in their own way, or to put on locomotives and trains at their pleasure, unless the legislature has authorized it."

There are four primary and well-settled fundamental principles which must be observed when appraising land in railroad use at its true value.

First: The land must be taken and valued in the actual condition in which the owner holds it on the assessing day. *State, Colwell, pros.,* v. *Abbott,* 42 *N. J. L.* 111; *Central Railroad of New Jersey* v. *State Board of Assessors,* 48 *Id.* 146; 4 *Atl. Rep.* 578; *Williams* v. *Bettle,* 51 *N. J. L.* 512; 18 *Atl. Rep.* 750; *Stevens Institute* v. *State Board, &c.,* 105 *N. J. L.* 99; 143 *Atl. Rep.* 356; *affirmed,* 105 *N. J. L.* 655; 146 *Atl. Rep.* 919; *Murphy* v. *West New York,* 132 *N. J. L.* 111; 39 *Atl. Rep.* (2d) 38; *State* v. *State Board of Tax Appeals,* 134 *N. J. L.* 34; 45 *Atl. Rep.* (2d) 599.

Second: The price, in money, at which the land would sell at a fair and *bona fide* sale between a willing seller and a willing buyer, is the only measure of true value. The Supreme Court's opinion in the case of *New Jersey Bell Telephone Co.* v. *Newark,* 118 *N. J. L.* 490, 494; 193 *Atl. Rep.* 844, which the Court of Errors and Appeals adopted on affirmance, 124 *N. J. L.* 451; 12 *Atl. Rep.* (2d) 675, said: "The interpretation generally given to the expression 'true value' as used in the constitution and tax laws, is that the valuation for taxation should be on the price which the assessor believes *could be obtained* for the property, in money, at a fair sale, * * * between a willing seller and a willing buyer; that is, one not obliged to sell dealing with one not obliged to buy. * * * *This would seem to indicate that the legislature conceived such a selling price to be the guiding indicia of true value.*"

Third: Land cannot be assessed at its value for railroad use. *Long Dock Co.* v. *State Board of. Assessors,* 78 *N. J. L.* 44; 73 *Atl. Rep.* 53; *affirmed,* 79 *N. J. L.* 604; 80 *Atl. Rep.* 1135.

Fourth: Land in railroad use has no market value because it is in public use. The Supreme Court said in the case of *State, Morris and Essex Railroad Co.* v. *Jersey City,* 36 *N. J. L.* 56, 61, that, "Lands acquired for a public use by a corporation under legislative powers, and in good faith held for that purpose, must be regarded, for purposes of taxation, as devoted to that public use." The Court of Errors and Appeals followed this same principle, in the case of *New York Bay Railroad Co.* v. *Newark,* 82 *Id.* 591, 593; 83 *Atl. Rep.* 962, 963, in which case the court said that the "land acquired under a legislative sanction that implies its permanent devotion to a public use cannot, without a violation of such public use, have a market for any other purpose and hence, as such a violation will not be presumed, such land has, in legal contemplation, no market value  *  *  *."

The first two principles above mentioned are uniform rules which must always be followed in making an appraisal of the true value of any land. The third and fourth principles are peculiar to land in railroad use. It seems impossible to follow these four principles and reach any rational appraisal of the true value of land in railroad use, for obviously they are contradictory—three and four nullifying one and two respectively. It is like trying to determine the true value of land in the bed of one of our state's super-highways by its market price—it has none. The solution to this dilemma must, therefore, be found in legislative policy, since the method for determining the true value of property must be left to the discretion of the legislature. *Central Railroad Co.* v. *State Board,* 75 *N. J. L.* 120, 154; 67 *Atl. Rep.* 672.

As I have stated, the first statute taxing land in railroad use after the adoption of the constitutional amendment in 1875 was the Railroad Tax Act of 1884. In that act the legislative scheme for assessing the true value of land in railroad use was to assess it at the same value as that of comparable land in the same taxing district not in railroad use. Since the true value of land not in railroad use was determined by its selling price, the true value of land in railroad use would be determined by the selling price of comparable land not in railroad use. This manner of

appraising land in railroad use was followed in the *Minnesota Rate Cases,* 230 *U. S.* 352; 57 *L. Ed.* 1511; 33 *S. Ct.* 729, where the United States Supreme Court, speaking through Mr. Justice Hughes, held that the market value of railroad property "cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. Otherwise we enter the realm of mere conjecture."

Common practice under a statute for a long period of time acquiesced in by all parties affected thereby may require acceptance of such practice as the law. Our Court of Errors and Appeals held that "whenever there is a debatable question as to the proper construction of a statutory provision, the contemporaneous and long continued exposition exhibited in the usage and practice under it requires the construction thus put upon it to be accepted by the courts as the true one." *Commonwealth Roofing Co.* v. *Riccio,* 81 *N. J. Eq.* 486; 87 *Atl. Rep.* 114; *In re Hudson County,* 106 *N. J. L.* 62; 144 *Atl. Rep.* 169; *Sargeant Bros., Inc.,* v. *Brancati,* 107 *N. J. L.* 84; 151 *Atl. Rep.* 843; *Burlington County* v. *Martin,* 129 *N. J. L.* 92; 28 *Atl. Rep.* (*2d*) 116. The opinion of the State Board of Tax Appeals in the 1933 railroad appeals stated that the method used for determining the true value of railroad property has been used since 1876. "The Board is of the opinion," it said, "that after nearly fifty years of judicial construction by the courts and acquiescence by the petitioners, the present method of assessing and determining true value must be regarded as a settled part of the law of this state." *Central Railroad of New Jersey et al.* v. *Martin,* 1912-1934 *New Jersey Tax Reports* 675. The Supreme Court's opinion on *certiorari* to review the determination of the 1933 railroad appeals by the State Board of Tax Appeals said:

"Mr. Louis Focht, a civil engineer since 1884, has been identified with the branch of the state department in charge of the detail work incident to the making of the assessments since 1898; he is the chief engineer of the division of railroad valuation and taxes; he was formerly employed by the Lehigh Valley Railroad Company of New Jersey for about sixteen years as a division engineer; and he has walked every foot

of railroad in this state. He was called and testified as a witness for the prosecutors and respondents. He said that the method employed in the making of the instant assessments, and herein complained of, is the method that has been employed in this state since 1884. * * *

"The board, as stated in its opinion, clearly set forth the method employed and the various factors which it considered in reaching its conclusions. * * * The practical construction given to the law by the board for nearly half a century on which it reached its conclusions is strong evidence that it is right. It has become the firmly rooted, established and fixed law applicable thereto. It cannot, under these circumstances, be changed by or through the judicial branch of our government. The relief, if any, prosecutors are entitled to have in the premises, must come, if at all, by or through the legislative branch of our government. This we think is the well settled law." Central Railroad Co. v. Thayer Martin, 114 N. J. L. 69, 73, 78; 175 Atl. Rep. 637.

Mr. Louis Focht, who is the same person mentioned in the foregoing excerpt from the opinion of the Supreme Court, was the chief engineer in the Division of Engineering and Railroad Taxes of the State Tax Department of New Jersey from May, 1898, until the time of his death in June, 1944. He was in charge of the valuation of all railroad property in New Jersey during those years. He was the chief engineer in charge of the special committee appointed in 1911 to revalue all the railroad property in New Jersey. In October and November, 1940, Mr. Focht testified before President Quinn of the State Board of Tax Appeals in the appeals of the 1939 railroad assessments. Part of his testimony taken at that time reads as follows:

"Q. During the period from 1898 to the present time have you been continuously responsible for the primary valuation of all property in New Jersey used for railroad purposes?

"A. Yes; that has been my duty and responsibility during all that time. The work is done by me personally, or under my direct supervision, in the Division of Engineering of the State Tax Department, of which I have charge.

"*Q*. To what extent are you personally familiar with the railroad property valued by your department?

"*A*. Prior to 1898 when I entered upon this work, I had worked for fourteen years on the Lehigh Valley and had charge of the construction of a substantial part of that railroad in New Jersey.

"I was also, during that time, generally familiar with the other railroads in New Jersey. I have watched many of them develop, since about 1883 from a number of small short lines into the present extensive network of railroads covering the entire state, which now serve as the terminal divisions not only of the foreign lessee trunk line companies but also of other trunk line railroads whose trains or traffic reach the port of New York over these New Jersey lines, by means of stock-ownership control, leasehold, interchange, or trackage rights.

"*Q*. Since 1898 to what extent have you personally inspected these railroad properties?

"*A*. During that time I have walked over and inspected on foot every mile of railroad in New Jersey; some parts of it several times.

"*Q*. Are you familiar with the statutory provisions under which the railroad properties are assessed and taxed?

"*A*. Yes, I made a study of the statutes when I entered upon my duties in 1898, and also of the practice and methods of my predecessors in those duties as disclosed by the records of the department, covering the period from the first assessments made in 1884 when the first general Railroad Tax Act was enacted down to the beginning of my duties in 1898. Since then I have been consulted about and have had more or less to do with all the amendments, or changes made in the law and have kept informed about them. Since 1898 I have personally administered the statutes continuously.

"*Q*. Has any general rule of valuation been followed since 1884 in the valuation of railroad property of the different classes prescribed by the statute?

"*A*. Yes. The state taxing authorities before me, and I, since 1898, have followed two general rules;

"(a) The constitutional requirement that all property should be assessed under uniform rules, according to its true value;

"(b) True value should be the value at which, in the judgment of the assessor, the particular property would sell for as of the assessing date, at *bona fide* sale between a willing buyer and a willing seller, neither of which was under any necessity or compulsion to deal with the other.

"*Q.* Has there been any change since 1884 in the method of valuation of railroad property for taxation?

"*A.* No, the records showed that method to be in existence in 1898 and had been in use since 1884, and, except for fourth class property, I have followed it consistently since that time down to and including the primary valuation for the year 1939. Same as in 1933.

"*Q.* Has this method of valuation been challenged in the courts?

"*A.* Yes, it was challenged in the contest by all of these railroads on their 1884 assessments, which was the very first assessment made under the act of 1884. It was again contested on the assessments for 1885. At that time that method was approved twice by the Supreme Court and once by the Court of Errors and Appeals. It was the chief ground of controversy in the contest of the 1933 assessments before the State Board of Tax Appeals, the New Jersey Supreme Court, the United States District Circuit Court of Appeals. No attempt has been made by the legislature to change it.

"*Q.* How do you determine the value of land?

"*A.* We are authorized by law to obtain our information of values from whatever sources we regard as dependable, and to use our own experience and judgment as to values of property. Information as to land values are obtained from various sources. We collect information of sales of land where we can obtain accurate sales prices. We study the assessed valuations of comparable land in the taxing districts in which these railroads own land. Although we do not accept such assessed valuations as correct and final, we exercise our judgment and if our valuations correspond with local assessed values of other property in the community, it is

because, by our tests and according to our personal knowledge, they are deemed to be correct. We have to avoid illegal discrimination which may result from assessing railroad property and other property by different standards, or percentages, of true value. Such discrimination has been claimed by the railroads for several years past in their appeals before this Board, and we have always been careful to preserve as nearly uniform standards of value as the nature and location of the property would permit. The standard of land values is different in different taxing districts and it would produce rank discrimination to use the same standard of value in Jersey City as in a rural community and *vice versa*. Except on vacant unimproved land, assessments are not made on land alone. It is only one of several component elements of the property assessed.

"*Q.* How do you apply that rule?

"*A.* The act requires us to ascertain the length of the main stem in each taxing district. We apply land values which in our judgment correspond to the value of other comparable land adjacent to the main stem in each taxing district. The land values of the section of main stem in each taxing district are component parts of, and are welded with the other elements of value into, a unit main stem valuation for each owning company.

"Since second class property is taxed at the local rate in each taxing district, the several parcels should, in my judgment, be valued on a basis comparable with other adjacent land of similar character, in order to avoid a discrimination in the amount of taxes assessed against one land owner as compared with another land owner.

"We do not add any increment of value to land because of its larger plottage or continuity in railroad use.

"*Q.* You say here that: 'Information as to land values are obtained from various sources,' and I suppose, you mean by that, that you obtain the land values of other land, land other than the railroad land?

"*A.* Yes.

"*Q.* You understand, do you, that when land is devoted to railroad purposes, such as a right of way between the Hudson

River and the Delaware River, that once that property is used as a main stem of a railroad, that it cannot be abandoned without the consent of the state and the federal government?

"*A.* It cannot.

"*Q.* I say, you regard that as a fact, do you not?

"*A.* We are aware of it.

"*Q.* Here is what I am referring to, Mr. Focht. In the record here before the State Board in the 1937 and 1938 cases, which we tried last year, at page 671 of the record, you testified with regard to land: '*We undertake to conform as nearly as possible to the valuation of adjacent or comparable land in the vicinity,*' and on page 784 you said, '*which may be used for industrial purposes, factories, or business, stores, warehouses and various uses of that kind,*' and on page 785: '*If the neighborhood carries a certain value, the railroad. properly ought to show the same. That is the way we look at it.*' Do you remember that?

"*A.* Yes, and that is just what I said now."

Honorable J. H. Thayer Martin, State Tax Commissioner from July 1st, 1931, to July 1st, 1941, testified on May 11th, 1939, in the hearings of the 1937-1938 railroad tax appeals before President Quinn of the State Board of Tax Appeals, and said that he had delegated to Mr. Louis Focht the responsibility for making the valuations of railroad properties in New Jersey, and that Mr. Focht had been so doing. He also testified that the method which Mr. Focht used to determine the value of railroad property was the method required by the statutes of New Jersey and approved by the courts of New Jersey. He said, "We try, he [Mr. Focht] tries to make sure of the price he believes can actually be obtained at the time for the particular piece of property; not a speculative price, but in so far as possible what apparently would be the actual selling value of the property, if it were put right up to be sold, for any use that the buyer; that the prospective buyer wanted to use it for." At another point in his testimony he said, "We endeavor to place on a parcel of railroad property the same basis of value that we find adjoining property can sell for."

Under date of February 22d, 1941, Governor Charles Edison's committee on railroad taxation in New Jersey submitted a report, in which report the committee said:

"It appears from the testimony of Mr. Focht, who is in charge of this work for the state, that two general rules have been followed by the state in valuing railroad property for taxes, namely (a) the constitutional requirement that all property shall be assessed under uniform rules according to its true value, and (b) 'true value' is value at which, in the judgment of the assessor, it would sell on the assessing date at a *bona fide* sale between a willing buyer and a willing seller, neither of whom was under any necessity or compulsion to deal with the other. * * *

"The railroads are, of course, public utilities in whose welfare the public has an important and profound interest. For this reason the railroads are not free as other corporations are to fix the terms and conditions upon which they do business. They cannot regulate their income because they cannot fix their own freight or passenger rates; they cannot relinquish unprofitable lines or property at will but only with the approval of public authority which is usually difficult to obtain; their rates of wages are matters of public concern and regulation; they are completely subservient to public regulatory bodies because they are public corporations. Their income is therefore largely beyond their individual control."

Pursuant to Senate Concurrent Resolution No. 8 (1941) a joint legislative committee constituted by said resolution submitted a report to the 165th Legislature on railroad taxation. In its letter of transmittal the committee said:

"The program presented with this report is the result of exhaustive study by Governor Edison's special Citizens' Committee on Railroad Taxation whose final report and recommendations were based upon research work and analysis furnished by the staff of the Princeton Surveys, of Princeton University."

The "Railroad Tax Law of 1941" supersedes the Railroad Tax Law revision of 1888 and its amendments and supplements. This 1941 act, the product of careful research and thorough study of prior railroad tax laws and methods of

assessing and taxing railroad property, was recommended to the New Jersey Legislature by the then Governor and by a special legislative committee on railroad taxation. The new law levies a tax on property in railroad use at its true value. In this respect the law is the same as it has been in New Jersey since 1884. The legislature, by the enactment of the 1941 law, in effect approved the method then in use for determining the true value of land in railroad use, which method had been used by the state's assessing authorities ever since the legislature expressly sanctioned it in its 1884 act, *i. e.,* the price at which comparable land not in railroad use would sell between a willing buyer and a willing seller.

In fact, the method used prior to 1941 for determining the true value of land in railroad use has actually been followed since 1941 in assessing the value of railroad property. Mr. Louis Focht testified on the appeals from the 1942 assessments on property of the Central Railroad Company of New Jersey, and he said:

"We acquire a familiarity, over a period of years, with the values of lands in the neighborhood of the railroad property to be valued and that is the basic element in the process of valuing the railroad land. Toward this end, we consider any sales of land in the general area and compare the property sold with that of the railroad property which we are assessing, * * *.

"We also consider, for comparison purposes, the assessed values of non-railroad property in the neighborhood * * *.

"In second-class lands, why, we have attempted to value them as nearly as possible on the same basis as the adjoining property, because it is part of that property."

In answer to the question, "Did you base your values on the sales of land in the neighborhood, comparable lands, in other uses?" Mr. Focht said, "Where we could find any, yes." Such values, he said, formed the base upon which he valued the land in railroad use. The Director of the Division of Taxation in the Department of Taxation and Finance of New Jersey testified before the Division of Tax Appeals on September 26th, 1945. His testimony applied to all appeals from the 1945 assessments on property used for railroad pur-

poses. He said that he had familiarized himself with Mr. Focht's method of determining the true value of property in railroad use, and that such method had been followed in determining the true value of railroad property for the 1945 assessments.

Therefore, the genesis of the current mode of appraising the true value of land in railroad use is found in the act of 1884, the first legislative enactment assessing the value of land in railroad use at its true value after the constitutional amendment of 1875. Hence, it is true that the method for determining the true value of comparable land not in railroad use is the only method approved by the legislature for determining the true value of land in railroad use. Moreover, experience has proved time and time again that any other method is but a time-consuming and costly matrix of chaos and confusion from which no appraisal of true value can rationally be formed.

The determination of the true value of railroad property is necessary not only to fix the amount of the property tax, but also (1) to calculate the franchise tax, and (2) to apportion the railroad tax revenue to the state and among the various municipalities. The 1941 act as amended sets up a formula for determining the net railway operating income for each railroad, and allocates a portion thereof to the state. The portion allocated to the state is capitalized at three per centum (3%), and the amount thus arrived at is called the "franchise base." From the franchise base is deducted the total amount of the true value of all property used for railroad purposes. The franchise tax is three per centum (3%) of the balance of the franchise base, except that the law provides for a minimum and a maximum franchise tax. If the total amount of the true value of all property used for railroad purposes should be greater than the franchise base, there would be no franchise tax, except for the provision in the law providing for a minimum franchise tax. It is, of course, obvious that the higher the railroad property is assessed for its true value, the lower will be the amount of the franchise tax, and, *vice versa*, the lower the railroad property is assessed for its true value, the higher will be the amount of the

franchise tax, except that the law provides for a maximum franchise tax. Therefore, it is possible to raise the assessed value of second-class railroad property to a level that would wipe out any franchise tax above the minimum amount. This would leave the state with only the revenues from the first-class railroad property and one-half the minimum amount of the franchise tax.

In this way, the property tax and the income or franchise tax are integrated. The calculation of each requires an appraisal of railroad property at its true value. The scheme arises from a definite legislative policy. "The present Railroad Tax Law (chapter 291, *Pamph. L.* 1941) was designed to protect both the state and the railroads in two ways:" first, by providing a minimum annual tax levy which would secure a reasonably definite amount of railroad tax revenue to the state and to the municipalities within the ability of the railroads to pay during years of low railroad earnings; and, second, by increasing the annual tax revenues during years of railroad prosperity by giving to the state and to the municipalities a share in the resulting expansion of railroad income during such years. (Report of the Joint Committee on the Operation of the 1941 Railroad Tax Laws to the Legislature, April 20th, 1942.)

All of the receipts from the railroad property tax, except from second-class property, and half of the receipts of the franchise tax go to the state. The receipts from the second-class property tax and the other half of the receipts from the franchise tax go to the municipalities. Each municipality receives such proportion of the total amount of railroad taxes allocated to municipalities as the true value of second-class railroad property situated within the municipality bears to the total true value of all second-class property in the state. Hence, the assessed or true value of second-class railroad land is a very important matter under the 1941 act because of the following three factors: (1) It determines the amount of the tax levied on such land; (2) It is one of the controlling elements in determining the amount of the franchise tax; and (3) It is used in determining the amount of railroad taxes the state and each municipality shall receive. There-

fore, excessive valuation assessments on second-class land in Jersey City illegally discriminate against the state and against other municipalities by depriving the state and the other municipalities of their fair and proper share of railroad taxes, Jersey City receiving more than its share of those taxes. Moreover, since part of the scheme of railroad taxation under the 1941 act is to fix a minimum tax within the ability of the railroads to pay during years of low railroad income, excessive assessments on railroad property might destroy this legislative policy.

Consequently, the utmost care should be used in determining the true value of property in railroad use lest the legislative scheme for taxing railroads be defeated. The efficient administration of a law will often point out its defects and suggest proper corrective remedies for the legislature to adopt. The executive branch of the government should, by efficient administration of the statutes, justify legislative enactments and not provide loopholes to accomplish their frustration.

True value is a fact to be determined from the evidence. An appraisal determines that fact—it does not create it. The Supreme Court of New Jersey expressed this principle in these words: "assessments must be based upon facts and not upon hopes." *C. F. Mueller Co.* v. *State Board of Tax Appeals,* 126 *N. J. L.* 141; 18 *Atl. Rep. (2d)* 564. And this is the only approach to the determination of true value. The appraiser cannot fabricate images of land values that have no foundation in reality; he is not an Alice in Wonderland, and the true value of land is not a myth. In the words of the United States Supreme Court, "Men do not pay cash for property in moonshine or dreamland." *Adams Express Co.* v. *Ohio State Auditor,* 166 *U. S.* 185; 17 *S. Ct.* 604; 41 *L. Ed.* 965. The law presumes that the hypothetical "willing seller" and "willing buyer" are reasonably intelligent, prudent persons. It also presumes that the conditions and circumstances of the hypothetical sale are fair and equitable in every respect. Hence the selling price cannot be based on a speculative venture. The selling price cannot be determined by the necessities of the buyer. Nor can it be a sacrifice price at which an owner by reason of other circumstances (that is,

circumstances not reflected in the contract of sale), is either willing or compelled to accept for his property. Our courts have also held that selling prices in an abnormal real estate market or under abnormal economic conditions cannot be accepted as the criteria of true value, because "true value" is much more substantial than either the price fluctuations in an irregular real estate market, or prices in the whirl of economic maladjustments. *Appeal of Pitney,* 20 *N. J. Mis. R.* 448; 28 *Atl. Rep.* (2d) 660; *Village of Ridgewood* v. *State Board of Tax Appeals,* 129 *N. J. L.* 121; 28 *Atl. Rep.* (2d) 303; *City Holding Co.* v. *State Board of Tax Appeals,* 127 *N. J. L.* 168; 21 *Atl. Rep.* (2d) 289; *City of Plainfield* v. *State Board of Tax Appeals,* 127 *N. J. L.* 5; 20 *Atl. Rep.* (2d) 651; *Colonial Life Insurance Co.* v. *State Board of Tax Appeals,* 126 *N. J. L.* 126; 18 *Atl. Rep.* (2d) 625; *City of Plainfield* v. *State Board of Tax Appeals,* 126 *N. J. L.* 407; 19 *Atl. Rep.* (2d) 815; *Borough of Hasbrouck Heights* v. *State Board of Tax Appeals,* 125 *N. J. L.* 617; 18 *Atl. Rep.* (2d) 24; *Universal Insurance Co.* v. *State Board of Tax Appeals,* 118 *N. J. L.* 538; 193 *Atl. Rep.* 915; *New Jersey Bell Telephone Co.* v. *Newark,* 118 *N. J. L.* 490; 193 *Atl. Rep.* 844; *affirmed,* 124 *N. J. L.* 451; 12 *Atl. Rep.* (2d) 675; *Colonial Life Insurance Co. et al.* v. *City of Jersey City,* 18 *N. J. Mis. R.* 60; 11 *Atl. Rep.* (2d) 14; *Hurd* v. *Cook, Collector,* 60 *N. J. L.* 70; 36 *Atl. Rep.* 892. Therefore, the true value of a parcel of land would not exceed the highest price which a purchaser would be warranted in paying for its unencumbered fee to use for its highest and best use for income or for some other form of profitable return or enjoyment. The United States Supreme Court said in the case of *Cleveland, Cincinnatti, Chicago and St. Louis Railway Co.* v. *Backus,* 154 *U. S.* 439; 14 *S. Ct.* 1122; 38 *L. Ed.* 1041, that "if property is taxed at its actual cash value, it is taxed upon something which is created by the uses to which it is put."

Adhering to the rules and principles approved by both the legislature and our courts for determining the true value of land in railroad use, I appraised the true value of the land of the Central Railroad Company of New Jersey here under appeal. My said appraisals and my reasons therefore appear in my opinion filed in the appeals from the 1943 assessments

on the same land which is here under appeal. My opinion is printed in 21 *N. J. Mis. R.* (at *pp.* 433, &c.) ; 34 *Atl. Rep.* (*2d*) (at *pp.* 560, *&c.*). By stipulation the evidence presented to the State Board of Tax Appeals in the aforesaid 1943 appeals became the record for determining the appeals from the 1945 assessments levied on the same land. I desire only to supplement briefly the reasons given in my said 1943 opinion.

Lot 21-B in Block 2154 is owned by the Central Railroad of New Jersey. Although surrounded by railroad tracks, it is not in railroad use. The said lot contains 16.52 acres of vacant solid upland, and lies within the Railroad's Jersey City Terminal Yard. Its assessed value for 1945 is $144,000, which is at the rate of $8,716.70 per acre. It lies between Yard "B" and the Claremont Coal Yard in the said terminal (second-class parcels 13 and 17, respectively), which are here under appeal. The land in Lot 21-B, Block 2154, is comparable to the land in said parcels 13 and 17. Parcel 13 is assessed at the rate of $20,000 per acre, and parcel 17 is assessed at the rate of $15,000 per acre. Here is a definite lack of uniformity in the assessments.

Lot 22-J, North, Block 2154, here under appeal, is waterfront property containing 91.219 acres. It lies about in the center of the Central Railroad Terminal Yard in Jersey City. It is assessed at the rate of $32,500 per acre for the year 1945. The dismissal of Jersey City's appeal and the Railroad's appeal affirms this assessment. The Division of Tax Appeals reduced the assessment for the year 1944 on Lot 22-J, North, from $32,500 per acre to $25,000 per acre.

Lot 48-F, Block 2145, here under appeal, is waterfront property in the Jersey City Terminal Yard of the Central Railroad. It contains 20.95 acres. It is assessed for the year 1945 at the rate of $45,000 per acre. The dismissal of Jersey City's appeal and the Railroad's appeal affirms this assessment. The Division of Tax Appeals reduced the 1944 assessment on this lot from $45,000 per acre to $40,000 per acre.

Consequently, I join with my colleagues in the Division of Tax Appeals in dismissing the appeal of Jersey City. However, for the reasons I have given, I am opposed to the dismissal of the Railroad's appeal.